

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00505-CV

IN THE INTEREST OF L.E.M. AND
S.G.M., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

After a bench trial, the trial court found by clear and convincing evidence that Appellants D.M.M. (Father) and S.T. (Mother) engaged in conduct or knowingly placed their daughters L.E.M. and S.G.M. with persons who had engaged in conduct that endangered the physical or emotional well-being of the children and knowingly placed or knowingly allowed L.E.M. and S.G.M. to remain in conditions or

---

[1]*See* Tex. R. App. P. 47.4.

surroundings that endangered their physical or emotional well-being.[2]  The trial court

further found that termination of Father's and Mother's parental rights was in the

children's best interest.[3]  Based on these findings, the trial court terminated the

parental relationship between Father and Mother and daughters L.E.M. and S.G.M.

In two issues, Father contends that the evidence is legally and factually

insufficient to support the endangerment and best interest findings against him and

complains that the order of termination violates his federal and state rights to due

process.  In four issues, Mother contends that the evidence is legally and factually

insufficient to support the endangerment findings against her and that the trial court

abused its discretion by denying her motion to extend the dismissal date and her

final oral motion for continuance.  Because we hold that (1) the evidence is legally

and factually sufficient to support the trial court's endangerment findings against

both parents and the best interest finding against Father, (2) the termination order

does not violate Father's rights to due process, and (3) the trial court did not abuse

its discretion by denying Mother's motion to extend the dismissal date or by denying

her final oral motion for continuance, we affirm the trial court's judgment.

**Sufficiency of the Evidence**

In proceedings to terminate the parent-child relationship brought under section

161.001 of the family code, the petitioner must establish one ground listed under

---

[2]See Tex. Fam. Code Ann. § 161.001(1)(D)–(E) (West Supp. 2012).

[3]*Id.* § 161.001(2).

2

subsection (1) of the statute and must also prove that termination is in the best interest of the child.[4]  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.[5]

Termination decisions must be supported by clear and convincing evidence.[6] Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[7] Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child.[8]

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven.[9] Here, Father and Mother each challenge the endangerment findings against them

---

[4]Tex. Fam. Code Ann. § 161.001 (West Supp. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

[5]*Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

[6]Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a) (West 2008).

[7]*Id.* § 101.007 (West 2008).

[8]*In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

[9]*In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

under subsections (D) and (E) of section 161.001, and Father challenges the best interest finding against him.[10]

We review all the evidence in the light most favorable to the finding and judgment.[11] We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so.[12] We disregard all evidence that a reasonable factfinder could have disbelieved.[13] We consider undisputed evidence even if it is contrary to the finding.[14] That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.[15]

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province.[16] And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable.[17]

---

[10]Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2).

[11]*J.P.B.*, 180 S.W.3d at 573.

[12]*Id.*

[13]*Id.*

[14]*Id.*

[15]*Id.*

[16]*Id.* at 573, 574.

[17]*Id.* at 573.

4

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own.[18]  Here, for each parent, we determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (D) or (E) of section 161.001(1).  For Father, who challenged the best interest finding, we also determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of his parental rights to the children is in their best interest.[19]  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.[20]

As we have explained in a similar case,

> Endangerment means to expose to loss or injury, to jeopardize.  The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child.  Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being.  Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.

---

[18]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

[19]Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

[20]*H.R.M.*, 209 S.W.3d at 108.

5

. . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth . . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.[21]

Additionally, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct jeopardizing the child's physical or emotional well-being.[22] Finally, even if a parent makes dramatic improvements before trial, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices."[23]

Father admitted to being involved in a domestic violence incident with Mother on September 1, 2007, in which he hit her in the mouth, slammed her against the

---

[21]*In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (citations omitted).

[22]*In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied).

[23]*In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

wall, and slammed her against the door. He also admitted that L.E.M. was in the apartment at the time.

On April 17, 2009, the police responded on two separate occasions to two separate domestic violence incidents occurring between Father and Mother. Officer Eric Montgomery responded to a 10:30 a.m. call. By the time he reached Mother's home, MedStar was attending to her as she lay on the floor. In response to Montgomery's repeated questions, Mother told him that she had fallen and hit her head. When he asked her again what had happened, she told him that she had high blood pressure and seizures that had caused her to hit her head.

At around 3:00 p.m., Montgomery assisted Officer Veronica Coronado in responding to another assault call. Mother was at a convenience store, wearing her pajamas. Mother told Montgomery that she had lied to him about how she had sustained her injuries in the earlier incident because she loved Father and did not want him to get in trouble. She admitted that Father had pushed her down and caused her to hit her head.

Mother told Coronado that Father had assaulted her that morning, she had gone to the hospital for her injuries and had been released, and then he had attacked her again. Mother told Coronado that Father had pushed her about ten times and had punched, slapped, and choked her. Mother reported to Coronado that Father had said to her, "Bitch, if you love me, you will fight for me. . . . Are you tired of fighting for me? Hit me back." Coronado testified that Mother had scratches on her face and minor abrasions on her neck. Mother admitted to Coronado that the

7

second incident was precipitated by her getting upset that Father was receiving text messages from another woman.

Coronado then went to speak with Father. Father told her that he and Mother had continued to argue after her release from the hospital and that she scratched him and ripped his necklace, causing abrasions on his neck. Father also told Coronado that Mother had almost run over him as she had driven off after the incident.

About six months later, at almost 2:00 p.m. on October 19, 2009, Officer Chris Bolling responded to a domestic disturbance call at Mother's home. He spoke to Father and Mother. Father told Bolling that he and Mother had been "tussling over the keys and she fell into the wall." Father also admitted to Bolling that he had punched Mother in the mouth.

Bolling testified that Mother's lip had been swelling and was bleeding and that her eye looked swollen as well. Mother told him that she and Father had been fighting because he had cheated on her. She also told Bolling that Father had punched her with his closed fist several times. Bolling testified that a child was in the home at the time of the incident and that he believed it was Mother's child. Bolling asked Mother if she wanted an emergency protective order and told her that "she needed to end the relationship for the good of her child and [that] the [emergency protective order] would help her." The police arrested Father for assault/family violence with bodily injury.

8

Mother testified that L.E.M. and S.G.M. "saw everything," including the beating, the police arresting Father, and the ambulance taking Mother to the hospital. Father admitted that he was placed on deferred adjudication for this conduct.

Officer Francisco Solano testified that on January 7, 2010, he responded to a criminal mischief report at Mother's home. When he arrived, he saw several items on the floor, including an entertainment center, a television, and a Christmas tree. Ornaments lay on the floor, and some had broken into smaller pieces. Mother told the officer that she had invited a neighbor into her apartment and that Father had entered the apartment directly behind that guest. Mother told Solano that Father had told her that he wanted to get back together, and he became upset when she told him that she had begun a relationship with someone else. Mother reported to Solano that Father had told her that he was "going to beat [her] face in" and that he was "going to kill [her.]" Mother also told Solano that Father had thrown the Christmas tree and entertainment center down on the floor, and the ornaments had broken. At least one of the daughters was in the apartment during the incident. Mother told Solano that her daughter ran into her room yelling, "Don't hurt Mommy." Solano opined that when a domestic violence incident occurs in a child's presence, then that child is endangered.

Teresa Moreno, a family based safety services (FBSS) supervisor for the Texas Department of Family and Protective Services (TDFPS), testified that in August 2010, when L.E.M. and S.G.M. were approximately four years old and two

9

years old respectively, TDFPS received a referral alleging neglectful supervision of them, drug use by Mother, and domestic violence. Specifically, L.E.M. had made an outcry that Father had spanked her, and she was bruised. Additionally, someone had reported that the children had been playing outside their apartment complex unsupervised. Mother told Moreno that she had seen bruises on "the little baby" and confirmed to Moreno that Father had caused that bruising. Moreno testified that she became concerned that the domestic violence was severe when she saw a lot of holes in the apartment walls and that the door had been kicked in. Mother told Moreno that Father had made the holes in the walls with his fists. The children's room contained holes in the walls as well. Father admitted later to TDFPS that he had put the holes in the walls, but he did not understand why TDFPS was concerned because he had paid for the damages.

TDFPS began offering FBSS services in September 2010. The parents did not complete any of the services during the FBSS portion of the case except that Mother completed a psychological evaluation. The children were placed with Mother and were to have only supervised contact with Father.

Officer Justin Swindell of the Fort Worth Police Department testified that he responded to a hit-and-run call on October 25, 2010. Father told Swindell that he had been driving along the highway when a red, four-door Geo Metro vehicle hit him. Father told Swindell that he had exited and stopped to exchange information with the other driver. But the other driver sped off. Father told Swindell that "one of the [Geo's] windows had been busted out" and that the driver looked like Mother.

10

Father told Swindell that he had called Mother, who had said, "[H]a, ha, ha, how did you like that, motherfucker[?]" and hung up. Swindell testified that red scrapes on the left side of Father's car were consistent with his story. Swindell also testified that he overheard a woman whom he believed to be Mother's sister tell Father in a telephone call that Mother had been driving a red Geo Metro earlier that day.

The police went to the apartment where Mother and the children were living and saw a red, four-door Geo Metro vehicle with damage to its right side. Although at first she told the police that she had not committed the hit-and-run, Mother admitted at trial that she had hit Father's car but contended that she did not do so intentionally. Mother was arrested and charged with aggravated assault with a deadly weapon. Our review of the record did not reveal that any evidence of prosecution for that offense was admitted at trial. Father, who was supposed to have only supervised contact with the children, was allowed to take the children after Mother's arrest. Father took the children to his mother's house. Mother testified that the children should not have been placed with Father's mother because she uses cocaine.

Before the alleged hit-and-run, Mother had confided to TDFPS that her father had molested her when she was a child. Mother also admitted to TDFPS that her father had stayed with her and the children from time to time. Officer Swindell testified that he confirmed that Mother had left the children with her father at the apartment while she was gone on the day of the alleged hit-and-run. Father also told Moreno that Mother had left the children with her father during the incident, and

11

the police confirmed it to TDFPS. Mother denied that accusation at trial and stated that she had left the children with a neighbor, not their grandfather, while she was out in the Geo.

Moreno testified that Father notified TDFPS that Mother had been arrested after the alleged hit-and-run and that she was still in jail. The children were then placed with his mother. Moreno testified that that placement later broke down because Mother would show up at various times of the day to see the children instead of respecting the times of visitation and because the children's paternal uncle, who had a criminal history involving allegations of sex abuse, moved in with the grandmother. Father testified that the breakdown of the placement had more to do with the restrictions placed on how many hours a day he could stay with the children at his mother's home and her finances. The children were next placed with a neighbor of Mother's.

Officer Philip Rice testified that he responded to a "fight" call on January 16, 2011 at a Quick Trip gas station and that he followed a crowd from that location to an apartment complex catty-cornered to the gas station. Mother was in the group, and she told him that she had been fighting with another woman because Mother had slept with the other woman's boyfriend. Rice issued the women citations for disorderly conduct.

Mother's neighbor who was caring for the children was also involved in the fight, and both women were evicted. At that point, according to Moreno, the children

12

were removed from the family and placed in non-relative foster care because there were no other placement options.

Moreno testified that Mother tested positive for marijuana during the FBSS portion of the case and that TDFPS had concerns about her mental health because Mother reported that she had been diagnosed as being bipolar but was not taking medication.

Mark Matthews, a licensed clinical psychologist, testified that he had performed a psychological evaluation of Mother in December 2010. Mother had told him that her father had a history of substance abuse, had been physically abusive to the family, and had molested her. Mother also told Matthews that she had been admitted to Austin State Hospital when she was thirteen years old and that she had been previously diagnosed with an anxiety disorder, bipolar disorder, depression, and an eating disorder. She also reported a history of "nervous breakdowns" and self-mutilation.

Regarding drug use, Mother told Matthews that she began smoking marijuana when she was eleven years old. She told him that she smoked "every day, all day" at her heaviest use, stopped when she discovered that she was pregnant with L.E.M., resumed that level of smoking after L.E.M.'s birth until the pregnancy with S.G.M., and then resumed smoking every two or three days after S.G.M.'s birth.

Emotionally, Mother told Matthews that she was "not right," and he noted that her mood was generally euphoric or upbeat during the interview. She told him that she has trouble sleeping, gets two to four hours of sleep a night, and frequently

goes "four or five days without sleeping." She also told him that her appetite was unstable.

Matthews testified that he diagnosed Mother with cannabis abuse, a bipolar II disorder, post traumatic stress disorder, partner relational problems, and physical abuse. He also recommended a psychiatric evaluation so that she could be evaluated for medication, but he testified that he did not believe that he had discussed the need for a psychiatric examination directly with Mother.

Ashley M. Williams, the third TDFPS caseworker on the case and the second since the January 2011 removal, testified that the first caseworker had given the parents their service plans. When Williams was assigned to the case in May 2011, Mother had completed only her psychological examination and domestic violence classes. Mother and Williams had a long talk, during which Mother told Williams that she and Father were "working things out." The women also talked about the services that Mother still needed to complete, like counseling and the psychiatric evaluation. Williams testified that Mother had already been told to get the psychiatric evaluation before Williams was placed on the case and that Mother had known to do so "for almost a year" before the trial. The women also discussed Mother's living situation. At that point, she was living with Father's father and his girlfriend. Williams was concerned that this living situation meant that Mother had not cut ties with Father.

When Williams spoke with Father the next day, he confirmed that he and Mother "were trying to work things out." Father had not completed any of his service

14

plan, which included completing courses in anger management and batterers' intervention, completing counseling sessions, and achieving stable income and housing. Williams told Mother that "it would be difficult for [TDFPS] to consider reunification if the parents were together and not completing services."

Williams testified that when TDFPS learned that the parents were back together, TDFPS changed the parents' visits with the children from individual visits to joint visits. But Williams testified that "around June," the children's behavior "became so extreme" that TDFPS separated the visits again, with the parents' agreement.

Williams also testified that Mother got in a fight with Father's father's girlfriend in June 2011. Williams stated that Mother later admitted to her that she was pregnant at the time. Despite her efforts, William was unable to speak with Mother from the end of June until July 21, 2011. Williams testified that on that day, Mother told her that she and Father were sexually involved and had spent the previous weekend together. Williams told both parents that TDFPS's goal had changed from reunification to termination. She discussed the parents' service plans with them again. She strongly encouraged Mother to seek counseling and get her psychiatric evaluation. Williams spoke to Father about counseling and his batterers' intervention classes. Williams testified that by this July meeting, the parents had completed their parenting class and Mother had begun working. On August 18, 2011, Mother had her first counseling appointment with Connie Burdick.

But on August 25, 2011, Mother called Williams to report that Father had called her and threatened to cut her throat. And in late October 2011, Mother told Williams that Father continued to threaten to cut her throat and "things of that nature," and Mother showed Williams her cell phone indicating thirty missed calls from him. Williams stated that Mother admitted to her that she sometimes knowingly answered his calls. Williams also testified that in October 2011, the month before trial, Father told her that Mother had called him to report that she had miscarried. At trial, he testified that he had not said that. Instead, he testified that he had told Williams that "word out on the street was [that Mother] had a miscarriage."

Williams stated that Mother did not complete her psychiatric evaluation until early September 2011. As far as housing, by September 2011, Mother had moved in with a friend at work who had a young child. But Mother did not move into her own apartment until November 1, 2011, less than a month before trial. The apartment is only about five minutes from Father and his family, and Mother told Williams that Father knows which apartment complex Mother lives in.

Williams testified that the parents had made minimal progress toward addressing her concerns. Williams admitted that Mother was working, had had three or four clean drug tests, had completed her domestic violence classes, had progressed in individual counseling, had completed her psychiatric evaluation, and had been on medication for a couple of months. Williams also admitted that she had seen progress in Mother.

16

Nevertheless, Williams was concerned about Mother's not starting her services until several months into the case, her staying in a relationship with Father until late July, her ability to take care of her mental health needs in the long run, and the chronic history of domestic violence. Mother herself had told Williams that mental health issues had caused much of Father and Mother's past conduct.

Williams was also concerned that Mother's "preoccupation with men" could affect her ability to care for L.E.M.'s mental health needs and that Mother would put her own needs ahead of L.E.M.'s. Williams explained that she did not believe that Mother would protect the children:

> [I]n the past she has shown that she cannot be protective, that she is always allowing him to come back into her life. They've always just continued to try to be in a relationship with each other over the past five years. And I don't know how we'll ever be able to determine whether or not she is truly done with that relationship.

Mother's Facebook page contained posts from Mother that concerned Williams. The post from October 1, 2011 reads,

> Tonight was wild we went to the park at 12 something and got hemmed up by the cops lol how they saw us still got us puzzled worst part he has a warr[a]nt an[d] I got two but we both were able to go home tonight Myst say[s] it would [have] been a good story to tell in [j]ail tho[ugh] Lmao[.]

Williams testified that "Lmao" means "laughing my ass off."

The October 29, 2011 post from Mother reads, "Whoo hooooo lol having fun drinking omg pi like a mother right now …..hahaha lovin that I'm free of the old I'm free so free lovin every moment[.]" The post was published less than a month

17

before trial, after the psychiatric evaluation, and soon after Mother had been placed on prescription medication regarding her mental health.

Williams was concerned about Father as well. He had not completed his service plan, so she had "no way to tell where he [was] at in his ability to care for [the children]." She also testified that he told her that "the plan all along was for [Mother] to get the children back" and that he used that as his excuse for not doing his services. Williams testified that she did not believe that it would be safe to return the children to either parent and that termination of the parental rights would be in the children's best interest.

Williams testified that the children had been placed in their third foster home as of April 30, 2011, because the first two homes could not manage L.E.M. and felt she was a risk. Williams also testified that L.E.M. was hospitalized in February 2011, June 2011, and twice in September 2011 and had "homicidal and suicidal ideation[s]," auditory hallucinations, and was hearing voices. According to Williams, "[L.E.M.'s] behaviors were just out of control."

The current foster mother testified that L.E.M. had "outbursts, rages. She was destructive. She would try to tear apart her clothes. She would try to destroy toys. She would harm the animals." S.G.M. also had issues. According to the foster mother, S.G.M. "had really long tantrums" and "would beat her head against the ground," as would L.E.M. L.E.M. "would also twist her hair and then pull it out."

The foster mother testified that at first, L.E.M. and S.G.M. were being bathed together, but L.E.M. "simulated sexual acts with her sister." The foster mother

testified that she and her husband then started bathing the sisters separately. But the foster mother testified that L.E.M. "simulated sex with her sister again in the living room" and also stuck "a Ken doll up Barbie's skirt and [made] . . . slurping noises."

The foster mother also testified that L.E.M. had told her that Father had held a knife to her face and that both L.E.M. and S.G.M. had said that their parents punched really hard, that the children were poked in the eyes when they misbehaved, and that they were kicked out of the house for misbehavior. Both children also reported that S.G.M. was burned on her hip.

One night in June, the foster mother heard choking sounds via the baby monitor in the girls' room. The next day, L.E.M. confessed to choking her sister. Also in June, L.E.M., who had an interest in knives, found a pair of nail clippers. (After the choking incident, the foster parents had locked the knives up.) When asked to give the clippers to the foster parents, L.E.M. refused and started beating her head against a brick wall. She was then admitted to a mental health treatment facility.

Jennifer Didier, a licensed social worker and therapist for the Excel Center, a day treatment center for children and adolescents, testified that after leaving the mental health treatment facility in July 2011, L.E.M. was admitted to the Excel Center (even though the center typically does not treat children under five years of age) because of the severity of her problems. Didier explained,

When [L.E.M.] came into our program, at home she was having a lot of physical and verbal aggression towards her foster parents and then also her sibling. She would have rages to where she wasn't able to control herself for extended periods of time. She was also having nightmares and trouble sleeping. And then within our program just a lot of inattentiveness, easily distracted. I didn't see aggression within our program, but she would at times appear to be having flashbacks when she would be talking about particular things. She was having some hypersexual behaviors with other peers in our group.

Didier testified that on July 7, 2011, L.E.M. told her that Mother had beaten her and hit her. On July 15, 2011, L.E.M. stated that her parents had kissed her all over her body, including her genital area. The foster mother testified that in mid-July, L.E.M. told her the same and also that it occurred while L.E.M. and her parents watched "nasty movies." On July 18, L.E.M. told Didier that when her parents would hit her, she would hide in the closet. On July 19, 2011, L.E.M. told Didier that she had watched "nasty movies" with Mother that made L.E.M. feel bad and that Mother had touched L.E.M.'s "pee pee." On July 21, 2011, Didier received a written report from the foster mother that L.E. M. was

continuing to have nightmares at home and that—[L.E.M.] reported having visual and auditory hallucinations and that [L.E.M.] reported the voices telling her to hit things and say bad words. . . . [The foster mother] also reported that [L.E.M.] ha[d] started engaging in hypersexual talk about men and women licking in nasty ways.

Williams received notification that L.E.M. had made an outcry of sexual abuse. It was ruled out against the parents.

L.E.M. also told Didier that she had been seeing bugs crawling on cabinets and under her bed. L.E.M. further reported to Didier that "her father would punch holes in the walls and hit her mother and sibling" and that he moved in and out of

20

the home often. L.E.M. told Didier that she would get scared, her body would shake, and she would hide in the closet. After sharing this information, L.E.M. isolated herself from the other children in the group. Didier also noticed that L.E.M. would get a "blank stare" or a "very blunt [a]ffect" on her face for fifteen or twenty seconds when discussing more traumatic events.

Didier testified that L.E.M. seemed to decompensate after visits with her parents—her aggression would increase; her hypersexuality in group sessions increased; and Didier would receive reports of nightmares, flashbacks, and hallucinations. So Didier suggested to the CASA volunteer that visits with the parents be suspended while L.E.M. was in treatment. Didier believed that would be in L.E.M.'s best interest.

The CASA volunteer, Cynthia Sinor, testified that Father brought gifts and food to the visits and sometimes other people. She also said that he "spen[t] a lot of time tickling the girls roughly. And he. . . also ha[d] a habit of—sort of scaring them with the policeman is going to come and get them if things don't go right, which [was] kind of upsetting to [Sinor] and a little upsetting to the kids sometimes."

Didier testified that it would be harmful to the emotional and mental well-being of a child to be exposed to domestic violence and physically or emotionally endangering to a child to have been hit by her parents and sexually abused as L.E.M. had described. When asked how children exposed to domestic violence behaved, Didier replied,

21

Some children exhibit a lot of anxiety and depression. Other children become very inattentive, irritable, decreased attention span. And some have a mixture of—of both of those types of varying behaviors. Kids be—can become verbally and physically aggressive, kind of mirroring the behaviors that they've witnessed. Sometimes kids kind of start ganging up on children that are younger than them and becoming more aggressive or intimidating.

Didier testified that she considered L.E.M.'s behavior, including her aggression toward her younger sister, consistent with her having experienced domestic violence.

When asked how children who have been sexually abused react, Didier replied,

Children that are sexually abused, it's—can be very similar to children who have been exposed to domestic violence. Again, with—it almost looks like they would have ADHD, it's kind of hyperactive behavior, inability to focus, inattentiveness, but a lot of hypersexual behavior, which by that I mean poor boundaries with others, inappropriate touching, touching of others or themselves, whether it's masturbating. They can also have nightmares and flashbacks. Sometimes hallucinations, it just depends on the level of acuity for the child.

Didier testified that she saw L.E.M. touch another student's clothed bottom with a pencil and that L.E.M. was always touching the other children and always wanting to give and receive hugs from the adult staff at the center. Didier characterized this behavior by the four-year-old as hypersexual.

Mother admitted that she had "fail[ed] to protect [her daughters] at the beginning." But she testified that the reason for her prior inability to protect her children was that she "was sick [her]self. [She] was a battered woman."

22

Father contended that he had had no unsupervised contact with his daughters after October 2009 except for the day of the alleged hit-and-run in October 2010. But Mother testified that Father had seen the children unsupervised a few times since the October 2009 assault. Nevertheless, Father denied the allegations of sexual abuse made by L.E.M. He also denied that he poked his daughters in the eyes and that they were afraid of him and hid in the closet.

The foster mother testified that in early September 2011, L.E.M. exhibited a lot of rage against the foster father and was still behaving destructively. S.G.M. started to imitate that behavior. On cross-examination, the foster mother testified that she had no knowledge of anything happening in the home that would cause L.E.M. to fear her husband and that her general impression was that L.E.M. does not like men.

L.E.M. was admitted to a mental health treatment facility again, and from there, in late September 2011, she was admitted to a residential treatment center (RTC) in Austin. As Didier explained, an RTC "is for patients who—their behavior is so severe that going inpatient for a couple weeks is not enough. It is a long-term treatment facility. It's a psychiatric hospital. So patients typically go there for six to [twelve] months." Didier had never had a patient as young as L.E.M. placed in an RTC.

The foster mother testified that L.E.M. has been diagnosed with severe posttraumatic stress disorder, severe depression with psychosis, oppositional defiance disorder, ADHD, and reactive attachment disorder.

Williams testified that she told the parents to let her know when they wanted to visit L.E.M. and she would arrange it with the RTC and provide Greyhound bus passes if necessary. Williams also testified that Mother told her that her sister could possibly take her to Austin and that Father told her that "they would possibly be able to make arrangements to visit." But neither parent had visited L.E.M. by the time of trial. Mother testified that she had not visited L.E.M. in Austin because she could not secure transportation, but she admitted that she went to California for Thanksgiving to visit her boyfriend's family because "[s]omebody took [her.]" The foster parents and S.G.M. did visit L.E.M. regularly at the RTC, including the weekend after Thanksgiving Day. The foster maternal grandmother also visited L.E.M. at the RTC.

Williams testified that both parents had called L.E.M. occasionally at the RTC. On cross-examination, she admitted that Mother had made twenty calls, Father had made five or ten, and the foster parents had made seven. Williams testified that on one of the phone calls between L.E.M. and Mother, L.E.M. said, "[Y]ou and dad tried to kill each other with a knife," and she told Mother that it had scared her. In another, L.E.M. asked about Father buying a new Christmas tree. In one conversation with Father, L.E.M. told him to never break the Christmas tree. Similarly, in a later telephone conversation with Father, L.E.M. asked if he and Mother would get married and asked him not to break her Christmas tree. In a different telephone conversation with Father, he stated that he wanted to squeeze L.E.M. until she "barf[ed] on [herself], and L.E.M. stated, "I don't love Daddy."

24

Williams testified that at the time of trial, S.G.M. was in the same foster home, and L.E.M. remained in the RTC in Austin. Williams stated that L.E.M. was then "having some issues" but was "somewhat stable." Later, Williams admitted that L.E.M. had "somewhat deteriorated at the RTC," that she was "zoning out" and having severe tantrums, and that she had been placed in a room alone because of her behaviors. Nevertheless, she attended regular school.

Williams testified that TDFPS's plan is for the children to be adopted and that the foster parents are adoption-motivated. Williams explained that "[t]he adoption subsidy would . . . provide ongoing Medicaid coverage" and that the children would also receive "free college and things of that nature."

Williams testified that she did not believe that the parents could meet the children's present and future emotional and physical needs but that she did think that the foster parents could meet those needs. Williams admitted that TDFPS had not offered the parents any training on dealing with the children's behaviors or special needs.

Although Father was working at the time of trial and making minimum wage, he was staying with a friend rent-free until he could "get on [his] feet." Father did not know his friend's last name or whether he had a criminal history. He had not paid any child support for the children's care. He had a car but no car insurance. Further, Mother testified that Father missed most of his visits with the children.

Williams stated that Father's plan was that Mother would have custody of the children, and Mother had stated that she would have the children in counseling and

25

"utilize any support that she could to take care of them." But Williams testified that Mother has not been able to show the stability of her home because she had only been in her apartment about a month when trial began. Williams further testified that "a lot of [L.E.M.'s] suicidal [and] homicidal ideations . . . occurr[ed]" after visits with Mother. "The children would reenact domestic violence in the home. They would say . . . that [the] police [were] going to come to get [them]." Williams testified that S.G.M. also had some negative behaviors after visits, such as pulling her hair and acting more defiantly. The foster mother testified that the girls were very agitated after visits with their parents. "They often had rages immediately after." Two weeks before trial, S.G.M. had a visit with Mother, and afterwards she spread her feces on the bathroom wall.

Regarding her concerns about returning the children to their parents, Sinor explained,

> Originally I was okay, I thought Mom—I know that they love—I know they love the children. And I was very much on the mom's side, and I was really trying to help. And then as the behaviors became more aggressive and more—you know, just nastier, I just felt that they will be difficult for Mom and Dad or either one or both to be able to provide for them. I feel that there are triggers there that are going to send these kids—you know, can affect the kids at any time, so that they can't— And you can't control those triggers. If they are there, they're going to go. And I just feel that they are not stable enough probably yet to have these children back.

Sinor admitted that she had seen Mother progress since the beginning of the case but testified that even if Mother had completed her services soon enough to show stability, that still would not "eliminate the problem of violence and anger and

26

things [like] that—that have gotten them to this point." Sinor testified that she did not believe it would be safe to return the girls to their parents and that she believed terminating the parents' rights would be in the children's best interest. Sinor testified that "it's probably safe—very safe for [the children] to be with the [foster parents]."

Kent Bass, a counselor at Catholic Charities, testified that he saw Mother two or three times. He testified that based on what he knew of her and what she told him, he believed that Mother is healthy enough that she could parent the children. He also testified that he believed that she had set up boundaries to keep her daughters and her safe from Father, for example, by avoiding phone contact.

Didier opined that in the future, L.E.M. is going to require a lot of therapy. At the same time, Didier believes that it's very important for L.E.M. "to be in a very stable and nurturing and understanding environment." Williams testified that the foster home is a stable placement for the children "[a]t this time." The foster mother testified that she would be willing to have L.E.M. live in her home again after she gets out of the RTC. The foster mother also testified that if the parents' rights are terminated, she and her husband would be interested in adopting the girls and that their goal is to keep the sisters together.

The foster mother further testified that she and her husband would make sure that the girls had an opportunity to see a counselor on a regular basis, that she has already checked into a school for emotionally troubled children for L.E.M., and that she has a flexible schedule.

Sinor testified that L.E.M. is doing well at the RTC but also that "[s]he is beginning to start more of those behaviors that got her to this point."

Regarding S.G.M., Sinor testified,

> She is very loving with the foster family. She seems to be—she has come out—She has become more of her own person since she is the only child in the family and she doesn't have to compete with anybody else. So she is becoming more of her own person. She is starting to exhibit more of the behaviors, like, she will rub herself until it hurts or she'll pull her hair or do things like that. I think she is doing more of that recently. Well, no, she did more of it when [L.E.M.] first went to the RTC. I think it has decreased lightly.

Sinor testified that she believed that the placement with the foster parents is good for S.G.M. She further testified, "I have never seen a set of foster parents so devoted to two children and willing to do whatever it requires to make sure that they get what they need so that they can, you know, create a life for themselves." Sinor also testified that the children have established "a big bond" with their foster parents.

Applying the appropriate standards of review, we hold that the evidence of Mother's long-term, frequent drug use; assaultive conduct, including her alleged hit-and-run with Father as the complainant; and her failure to protect the children from Father, combined with the children's statements of physical abuse at her hands, is legally and factually sufficient to support the trial court's endangerment findings against her. We overrule Mother's third and fourth issues.

Applying those same standards of review, we hold that the evidence of Father's repeated acts of domestic violence against Mother, sometimes in at least L.E.M.'s presence, coupled with the children's statements of physical abuse at his

28

hands, is legally and factually sufficient to support the trial court's endangerment findings against him.

Father also challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of his parental relationship with L.E.M. and S.G.M. is in their best interest. Consequently, in our legal sufficiency review, we review all the evidence in the light most favorable to the finding and judgment to determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the best interest ground for termination was proven.[24] In our factual sufficiency review, we determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of Father's parental rights is in the children's best interest.[25]

There is a strong presumption that keeping a child with a parent is in the child's best interest.[26] Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.[27] The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

---

[24]*J.P.B.*, 180 S.W.3d at 573.

[25]Tex. Fam. Code Ann. § 161.001; *H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28.

[26]*In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

[27]Tex. Fam. Code Ann. § 263.307(a) (West 2008).

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

    (A) minimally adequate health and nutritional care;

    (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

    (C) guidance and supervision consistent with the child's safety;

    (D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and

(F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.[28]

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.[29]

These factors are not exhaustive; some listed factors may be inapplicable to some cases.[30]   Furthermore, undisputed evidence of just one factor may be

---

[28] *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

[29] *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

31

sufficient in a particular case to support a finding that termination is in the best interest of the child.[31] On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.[32]

Father admitted to committing domestic violence in L.E.M.'s presence, and the girls both reported physically violent acts he committed against them. L.E.M. told him in a phone call that she did not love him, and she appears obsessed with his violence involving the Christmas tree. He also admitted to not completing his service plan and stated that the goal had been for the children to be returned to Mother, not him. Mother stated that he missed many of his scheduled visits with the children, and the foster mother, Williams, and Didier all testified that the children decompensated after parental visits. Father further had not investigated the environment into which he would be moving his daughters had they been returned to him at trial—he did not even know his roommate's last name.

On the other hand, the foster parents have visited L.E.M. regularly at the RTC with her sister and have begun investigating a special school for L.E.M. in the event that she is returned to their care. They have further committed to obtaining regular counseling for the girls and to trying to keep the girls together. Applying the appropriate standards of review, we hold that the evidence is legally and factually

---

[30]*C.H.*, 89 S.W.3d at 27.

[31]*Id.*

[32]*Id.*

sufficient to support the trial court's best interest finding against Father. We overrule Father's first issue.

**Due Process Violation**

In his second issue, Father contends that the trial court's order terminating his parental rights violates his rights to due process under the state and federal constitutions. But his only argument within this issue is that his due process rights were violated because the evidence is insufficient to support the endangerment and best interest findings. Because we have held otherwise, we overrule Father's second issue.

**Dismissal Date**

In her first issue, Mother complains that the trial court abused its discretion by denying her motion to extend the dismissal date. Section 263.401 of the family code provides,

> (a) Unless the court has commenced the trial on the merits or granted an extension under Subsection (b), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child.

> (b) Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child. If the court makes those findings, the

33

court may retain the suit on the court's docket for a period not to exceed 180 days after the time described by Subsection (a).[33]

Because an extension of the dismissal date is similar to a continuance and section 263.401(b) does not specify which appellate standard of review should apply, we apply the abuse of discretion standard.[34] We decline TDFPS's invitation to overrule our own precedent and to instead hold that parents may not complain of a trial court's decision whether to extend a suit's dismissal date.

Mother sought an extension of the dismissal date on November 10, 2011, less than two weeks before trial began, and the hearing on the motion was held November 15, 2011, a week before the trial was scheduled to begin. The stated basis for the motion was to allow Mother more time to show TDFPS that she could "provide a safe and appropriate home for her children." Mother had been in her own apartment just two weeks when the motion was heard.

The evidence showed that the removal occurred about nine and a half months before the hearing on Mother's motion to extend the dismissal date. Mother gave the following testimony at the hearing:

> Q [TDFPS attorney:]    But you've known that it's been an issue for CPS since the removal in January—were you aware that stable housing was an issue for CPS and they've encouraged you to have stable housing?
>
> A    Yes, ma'am, I'm aware of that, but you have to have a job in order to be able to pay bills.

---

[33]Tex. Fam. Code Ann. § 263.401 (West 2008).

[34]*In re T.T.F.*, 331 S.W.3d 461, 476 (Tex. App.—Fort Worth 2010, no pet.).

. . . .

Q      Where were you living through spring of April, May, June of this year?

A      I was bouncing around with friends.

. . . .

Q      Did you meet your caseworker Ashley Moore in May of 2011?

A      I believe so.

Q      And did Ashley tell you at that time that it was very important for you to have stable housing?

A      Yes, she did.

The trial court had approved the service plan at a March 30, 2011 status hearing attended by Mother's counsel but not by Mother, who was not working at the time. In addition to Mother's having not yet shown an ability to maintain stable housing by the time of the hearing on her motion to extend the dismissal date, TDFPS was also concerned that she had not been on her mental health prescriptions very long and that she had not been out of a relationship with Father for at least six months.

But Mother had known of TDFPS's concerns about the stability of her housing since at least the removal, the trial court had signed the order approving the service plans at the end of March 2011, and the caseworker had again emphasized to Mother in May 2011 that she needed stable housing. Given Mother's delay in beginning and completing her services, we cannot say that the trial court abused its

discretion by failing to find that extraordinary circumstances justified a 180-day extension of the dismissal deadline.[35] We overrule Mother's first issue.

**Continuance**

In her second issue, Mother complains that the trial court abused its discretion by denying her third motion for continuance, brought orally on the day before the trial ended. Mother had also raised an oral continuance regarding the same absent witness on the first day of trial, which was denied. An amended motion for continuance filed on the first day of trial and a second amended motion filed on the day before the trial ended appear in the clerk's record. Neither is supported by an affidavit, and there is no indication that the trial court ruled on either of them.

A motion for continuance shall not be granted except for sufficient cause supported by an affidavit, through consent of the parties, or by operation of law.[36] If a motion for continuance is not made in writing and verified, it will be presumed that

---

[35]*See In re D.K.*, No. 02-09-00117-CV, 2009 WL 5227514, at *2 (Tex. App.—Fort Worth Dec. 31, 2009, no pet.) (mem. op.) (holding that trial court's determination that mother who did not visit children during pendency of case failed to present extraordinary circumstance was not abuse of discretion); *In re L.D.K.*, No. 02-07-00288-CV, 2008 WL 2930570, at *3 (Tex. App.—Fort Worth July 31, 2008, no pet.) (mem. op.) (holding father who argued service plan was deficient because of misnomer despite evidence that he knew what was expected of him failed to present any extraordinary circumstances that would necessitate an extension); *Shaw v. Tex. Dep't of Family & Protective Servs.*, No. 03-05-00682-CV, 2006 WL 2504460, at *8 (Tex. App.—Austin Aug. 31, 2006, pet. denied) (mem. op.) (holding mother did not show that needing more time after failing to make progress on the service plan for eight months amounted to extraordinary circumstances).

[36]Tex. R. Civ. P. 251; *see In re E .L.T.*, 93 S.W.3d 372, 374–75 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

the trial court did not abuse its discretion by denying the motion.[37] Because Mother did not comply with rule 251, the trial court did not abuse its discretion by denying her oral motion for continuance.[38] Accordingly, we overrule Mother's second issue.

**Conclusion**

Having overruled Father's two issues and Mother's four issues, we affirm the trial court's judgment.

PER CURIAM

PANEL: DAUPHINOT, J.; LIVINGSTON, C.J.; and GARDNER, J.

DELIVERED: October 18, 2012

---

[37] *See Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex.1986); *E.L.T.*, 93 S.W.3d at 375.

[38] *See Villegas*, 711 S.W.2d at 626; *see also In re A.C.H.*, No. 02-11-00072-CV, 2012 WL 1345759, at *15 (Tex. App.—Fort Worth Apr. 19, 2012, no pet.).

37